731 So.2d 680 (1998)
Ruth O'KEEFE, individually and as Personal Representative of the Estate of Daniel E. O'Keefe, and Guardian for Christopher O'Keefe, an incompetent, Appellant,
v.
David A. OREA, M.D. and Psychiatric Consultants, P.A., Appellees.
No. 96-3519.
District Court of Appeal of Florida, First District.
January 12, 1998.
Rehearing Denied April 28, 1998.
*681 Scott A. Mager of Mager & Associates, P.A., Ft. Lauderdale, for Appellant.
Charles Thomas Shad and M. Mark Bajalia of Saalfield, Coulson, Shad & Jay, P.A., Jacksonville, for Appellees.
Alan K. Ragan of Marks, Gray, Conroy & Gibbs, P.A., Jacksonville, for Florida Defense Lawyers Association, Amicus Curiae.
JOANOS, Judge.
Ruth O'Keefe, appellant, appeals a final order dismissing her amended complaint with prejudice for failure to state a cause of action. We reverse.
Appellant's amended three-count complaint alleged medical malpractice of Dr. David Orea and his employer, Psychiatric Consultants, P.A. (appellees), in the psychiatric care and treatment of her son, Christopher O'Keefe, as well as in the care of appellant and her husband, Daniel O'Keefe, both of whom consulted Dr. Orea about their inability to cope with their son's deteriorating condition. The trial court granted appellees' motion to dismiss, finding the complaint failed to state a cause of action on the basis of Boynton v. Burglass, 590 So.2d 446 (Fla. 3d DCA 1991).
The general allegations of the complaint establish that Christopher O'Keefe was seen by Dr. Orea on May 10, 1993, for evaluation and treatment of behavioral changes associated with physical manifestations. Christopher had a history of learning and behavioral disorders, and earlier neuropsychological testing showed him to be emotionally and mentally handicapped. Dr. Orea concluded Christopher was suffering from depression, and prescribed antidepressant medications and followup counseling. The complaint further alleged that on June 17, 1993, Ruth O'Keefe began treatment with Dr. Orea for depression and inability to cope with her son's deteriorating condition. The complaint then alleged that on June 18, 1993,
Dr. Orea admitted Christopher to Baptist Medical Center on an emergency *682 basis due to his escalating, uncontrollable and dangerous behavior, associated to psychotic symptoms including, just prior to his admission to Baptist Medical Center, the fact that CHRISTOPHER physically attacked three people who were very close to him: Patrick, his brother whom he loved very much; John Carraway, his school teacher and coach whom he respected very much; and a friend of his from school. These three attacks were each bizarre, abrupt, violent outbursts and very uncharacteristic of CHRISTOPHER.
Paragraphs 10 through 13 of the amended complaint alleged:
10. Over the course of his hospital stay, CHRISTOPHER O'KEEFE continued to demonstrate an increase in psychotic behavior, including visual hallucinations, neologisms and delusions, which were not effectively controlled by medications. He was observed by the treating staff and nurses at Baptist Medical Center as behaving in an aggressive, hostile and inappropriate manner throughout his hospitalization, requiring constant one to one observation and supervision to prevent harm to himself and other patients. Significantly, CHRISTOPHER was observed as being markedly agitated and hostile to his parents, particularly toward his father.
11. On or about July 13, 1993, Daniel O'Keefe also sought treatment with DR. OREA and PSYCHIATRIC CONSULTANTS, P.A. for treatment and counsel for his anxiety and frustration over his son's severe psychiatric condition and his inability to cope with CHRISTOPHER's deteriorating condition. Dr. Orea thus had a special relationship with Christopher, Ruth, and Daniel O'Keefe in that:
A. All three of the O'Keefes were current patients of Dr. Orea; Dr. Orea knew that the parents were having a great deal of difficulty managing and controlling their son; and Dr. Orea knew CHRISTOPHER had, just prior to his admission to the hospital, physically attacked three people who were very close to him: Patrick, his brother, John Carraway, his school teacher and coach, and one of his friends from school;
B. At age 17 CHRISTOPHER was approximately 5 feet 11 inches tall and weighed approximately 160 pounds; he was athletic and stronga swimmer on the school/community swim team that summerand was known by Dr. Orea to be physically stronger than both his mother, RUTH, and his father, DANIEL, age 73; and
C. CHRISTOPHER was a child at the time of Dr. Orea's treatment.
12. On July 16, 1993 DR. OREA made the determination that CHRISTOPHER O'KEEFE was stable enough to be discharged from Baptist Medical Center and felt that, given the fact that CHRISTOPHER was not at risk and did not meet criteria for involuntary hospitalization, it would be appropriate to try outpatient treatment.
13. On July 19, 1993, RUTH O'KEEFE informed DR. OREA by telephone that CHRISTOPHER was acting out of control and could not be cared for at his parents' home; DR. OREA just ordered a change in a prescription for medication. The following day on July 20, 1993, just four days after his discharge by DR. OREA from Baptist Medical Center, CHRISTOPHER O'KEEFE attacked both of his parents and killed his father, Daniel O'Keefe.
Count I of the complaint alleged that Dr. Orea "took control" of Christopher when he admitted Christopher to Baptist Medical Center, and Dr. Orea "knew or should have known" that Christopher was likely to cause bodily harm to others if not controlled. Paragraphs 16 and 17 alleged:
16. Dr. Orea had a duty to exercise reasonable care and to meet acceptable standards for psychiatric health care providers in the care and treatment of *683 CHRISTOPHER O'KEEFE, his inpatient, and to control CHRISTOPHER O'KEEFE, to prevent him from causing bodily harm to others, and to warn or protect those, particularly those to whom Dr. Orea had a special relationship, who might reasonably come in contact with this problem-child since:
One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not reasonably controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm (Restatement Second of Torts, Section 319 (1965)).
17. DR. OREA thus had a duty to exercise reasonable care and to meet acceptable standards for psychiatric health care providers in the care and treatment of CHRISTOPHER O'KEEFE and to control CHRISTOPHER O'KEEFE to prevent him from causing bodily harm to others.
Paragraph 18 of the complaint sets forth the specific acts and omissions which allegedly constituted a breach of Dr. Orea's duty to meet acceptable standards for psychiatric health care providers. This provision states that Dr. Orea breached his duty in one or more of the following ways:
A. By failing to appropriately and timely diagnose CHRISTOPHER O'KEEFE'S condition;
B. By failing to consult with other specialists who could have provided a proper diagnosis and/or an adequate treatment plan for CHRISTOPHER;
C. By failing to perform adequate diagnostic medical and psychological testing;
D. By failing to provide adequate and effective medications;
E. By failing to adequately investigate CHRISTOPHER's hallucinations and delusions;
F. By failing to adequately review and consider the nursing progress notes in CHRISTOPHER's treatment resulting in a continuous absence of coordination between the treating psychiatrist and the nursing staff;
G. By failing to timely prepare CHRISTOPHER's medical records;
H. By releasing CHRISTOPHER on July 16, 1993 from Baptist Medical Center to his parents despite CHRISTPHER's active symptoms of psychosis clearly marked in the nurse's notes including hallucinations, speaking in neologisms, delusions, violence, agitation, in-appropriate sexual preoccupation, threats to staff, the need for two strong male guards to deal with CHRISTOPHER at various times, and sleep disturbance, when he knew or should have known that CHRISTOPHER was likely to cause bodily harm to his parents who were within the anticipated zone of danger and zone of risk;
I. By failing to gradually integrate CHRISTOPHER back into his family life at home;
J. By failing to inform RUTH AND DANIEL O'KEEFE of the nurse's notes indicating active hallucinations, speaking in neologisms, delusions, violence, agitation, threats to staff, and the need for two strong male guards to deal with CHRISTOPHER at various times;
L. By failing to disclose to RUTH AND DANIEL O'KEEFE suicidal tendencies as noted in the nurse's notes of June 25, 1993, and to give precautions/warnings about those tendencies;
M. By failing to disclose other psychiatrists' recommendations and observations including Dr. Wikstrom's recommendation on July 3, 1993 that Clozaril might be a more effective medication and that electroconvulsive theraphy might be appropriate; and that Dr. Burak had, on 6/19/93 suspected CHRISTOPHER was schizophrenic.
Paragraph 19 of the complaint alleged that:

*684 As a direct and proximate result of DR. OREA's negligence CHRISTOPHER O'KEEFE, while at his parents' home, attacked his parents, choking his mother, RUTH O'KEEFE, and killing his father, Daniel O'Keefe.
The elements of a cause of action in tort are: (1) a legal duty owed by defendant to plaintiff, (2) breach of that duty by defendant, (3) injury to plaintiff legally caused by defendant's breach, and (4) damages as a result of that injury. Paterson v. Deeb, 472 So.2d 1210, 1214 (Fla. 1st DCA 1985), review denied, 484 So.2d 8 (Fla.1986); Cooper Hotel Services, Inc. v. MacFarland, 662 So.2d 710, 712 (Fla. 2d DCA 1995), review denied, 670 So.2d 939 (Fla.1996).
Tort law holds professionals to a more stringent standard than lay persons are required to meet. W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 32 (5th ed.1984); Andrew Clifford Greenberg, Florida Rejects a Tarasoff Duty to Protect, 22 Stetson L.Rev. 239, 270 (1992). The medical negligence standard of recovery is set forth in section 766.102(1), Florida Statutes, which states in part:
(1) In any action for recovery of damages based on the death or personal injury of any person in which it is alleged that such death or injury resulted from the negligence of a health care provider ... The prevailing professional standard of care for a given health care provider shall be that level of care, skill, and treatment which, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by reasonably prudent similar health care providers.
Appellees in this case urge the primary question is whether, this court should impose a legal duty upon a psychiatrist to control his patient, and to warn a potential victim that the psychiatrist's patient poses a serious threat of violence to that potential victim. A variation of this question was decided affirmatively by the California Supreme Court in Tarasoff v. Regents of University of California, 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334 (1976).
It appears the question whether a mental health care provider owes a duty to warn third persons of the dangerous propensities of a patient has been addressed in only two reported Florida decisions. Appellees and amicus Florida Defense Lawyers Association adopt the reasoning of, and rely upon the authorities cited in, the plurality opinion in Boynton v. Burglass, 590 So.2d 446 (Fla. 3d DCA 1991), an en banc decision. Appellant espouses the principles articulated in the Boynton dissent, but also maintains that under the unique facts of this case, Boynton does not apply.
The issue in Boynton was whether a mental health professional has a common law duty to warn the intended victim of a patient's potential for future dangerousness. The Boynton majority refused to follow Tarasoff. Recently, in Green v. Ross, 691 So.2d 542 (Fla. 2d DCA 1997), the Second District agreed with, and relied upon, the majority opinion in Boynton.
Because we believe the amended complaint sufficiently states a cause of action for medical negligence pursuant to section 766.102(1), Florida Statutes, we find it unnecessary to reach the Boynton/Tarasoff "duty to warn" issue. Among other things, count one of the complaint alleges that Dr. Orea breached his duty to exercise reasonable care and to meet acceptable standards for psychiatric health care providers in the care and treatment of his patient, Christopher, by: failing to appropriately and timely diagnose Christopher's condition, by failing to consult with other specialists who could have provided a proper diagnosis and treatment plan for Christopher, by failing to perform adequate diagnostic medical and psychological testing, by failing to provide adequate and effective medications, by failing to adequately investigate Christopher's hallucinations and delusions, by failing to adequately *685 review and consider the nursing progress notes resulting in a continuous absence of coordination between the treating psychiatrist and the nursing staff, and by failing to inform the O'Keefes of the information in the nursing progress notes. The complaint further alleges that as a direct and proximate result of Dr. Orea's negligence, Christopher attacked and injured both of his parents, and killed his father. The complaint then sets forth the damages incurred as a result of Dr. Orea's negligence.
Until recently, the general rule in Florida was that a physician owes a duty only to persons within the patient/physician relationship, with the single exception being the contagious disease cases with readily identifiable third parties. See Werner v. Varner, Stafford & Seaman, P.A., 659 So.2d 1308, 1309 (Fla. 4th DCA 1995). However, in Pate v. Threlkel, 661 So.2d 278, 280 (Fla.1995), the court extended the boundaries of a physician's duty to require a health care provider to warn a patient of the importance of testing her children for the genetically transferable condition for which the physician was treating the patient. The court stated:
We conclude that when the prevailing standard of care creates a duty that is obviously for the benefit of certain identified third parties and the physician knows of the existence of those third parties, then the physician's duty runs to those third parties.
661 So.2d at 282. In Pate, the court held the duty is discharged by the physician's warning to his patient. The court reasoned it would be too burdensome to require the physician to seek out and to warn the identifiable third party directly. 661 So.2d at 281-282.
In a somewhat related vein, in Nova University, Inc. v. Wagner, 491 So.2d 1116 (Fla.1986), the supreme court considered an institution's duty to control children placed in its care. The university operated a residential rehabilitation center which, for a fee, attempted to rehabilitate children who could not be controlled by parents, foster parents, or legal guardians. To determine whether the facility had a duty to operate in such manner as to avoid harm to the general public, the court consulted the Restatement (Second) of Torts § 319, which provides:
One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm.
The court then applied these tort principles to hold that "a facility in the business of taking charge of persons likely to harm others has an ordinary duty to exercise reasonable care in its operation to avoid foreseeable attacks by its charges upon third persons." 491 So.2d at 1118.
One view imposes the duty to warn or to control only on those persons who have the ability or the right to control the third party's behavior. Boynton, 590 So.2d at 448; Santa Cruz v. N.W. Dade Community Health Center, Inc., 590 So.2d 444, 445 (Fla. 3d DCA 1991), review denied, 599 So.2d 1278 (Fla.1992); Paddock v. Chacko, 522 So.2d 410, 416 (Fla. 5th DCA 1988), review denied, 553 So.2d 168 (Fla.1989); Hasenei v. U.S., 541 F.Supp. 999, 1009 (D.Md.1982). In actual practice, the duty seems to relate more to foreseeability than to the defendant's ability to control the actions of third parties. See, e.g., Lipari v. Sears, Roebuck & Co., 497 F.Supp. 185, 195 (D.Neb.1980)(psychotherapist would be liable to plaintiffs only if he could have reasonably foreseen an unreasonable risk of harm to plaintiffs or a class of persons of which plaintiffs were members).
In this case, according to the allegations of the amended complaint, Dr. Orea knew or should have known of his patient's history of learning and behavioral disorders, knew of the patient's deteriorating condition during outpatient treatment, knew the patient physically attacked three people shortly before his emergency admission to the hospital, knew the patient demonstrated increasingly psychotic behavior which *686 was not controlled by medication, knew the patient behaved in such a hostile aggressive manner that he required constant supervision to prevent harm to himself and to others, and knew the patient was markedly agitated and hostile to his parents, particularly his father. Despite his access to this information, Dr. Orea discharged the patient to his parents' custody. Three days after Christopher O'Keefe's discharge, Dr. Orea received a telephone call from the patient's mother, who also was Dr. Orea's patient. Mrs. O'Keefe reported that her son was acting out of control, and his parents could no longer care for him at home. Allegedly, Dr. Orea's response was to order a different medication. The following day, the patient attacked both of his parents, injuring his mother and killing his father.
The law imposes a duty upon a parent to support a child until that child attains majority. In conjunction with that parental duty, the right to consent to medical treatment for a child resides in the parent who has the legal responsibility to maintain and support the child. Ritz, 436 So.2d at 989. Implicit in the parent's right to consent to proposed medical treatment for his minor or otherwise incompetent child, is the right to be fully informed concerning the child's condition and prognosis. "An attending physician has a strong duty to fully address the concerns of patients and to be fully candid with them." University of Miami v. Bogorff, 583 So.2d 1000, 1003 (Fla.1991). The doctor-patient relationship creates a duty to disclose a diagnosis. See Mangoni v. Temkin, 679 So.2d 1286, 1288 (Fla. 4th DCA 1996).
Dr. Orea's duty to warn the O'Keefes concerning their son's condition derives from the fiduciary relationship between Dr. Orea and the parents of his minor patient, as well as the physician-patient relationship between Dr. Orea and Mr. and Mrs. O'Keefe. In view of these fiduciary relationships, Dr. Orea had a duty to inform Christopher's parents concerning their child's diagnosis, including the diagnosis of other physicians who had observed Christopher, together with his personal treatment recommendations and the treatment recommendations of other physicians. In addition, Dr. Orea had a duty to disclose the information available in the nurse's notes concerning Christopher's hallucinations, violence, threats to staff, suicidal tendencies, and the fact that at various times two male guards were required to control him.
"In testing a complaint on a motion to dismiss, all facts properly pleaded are deemed admitted." See Fearick v. Smugglers Cove, Inc., 379 So.2d 400, 402 (Fla. 2d DCA 1980). See also Sylvester v. City of Delray Beach, 486 So.2d 607 (Fla. 4th DCA 1986). We conclude the allegations of appellant's amended complaint sufficiently state a cause of action for medical negligence.
Accordingly, the final order of dismissal with prejudice is reversed, and this cause is remanded for further proceedings.
VAN NORTWICK, J., concurs.
BOOTH, J., dissents without written opinion.